## Case No. 14,347.

### The UNION.

[Blatchf. & H. 545.] [1]

District Court, S. D. New York.   Sept. 17, 1836. [2]

SEAMEN—WAGES—DESERTION—ACT OF CONGRESS.

1. Under the maritime law, there can be no desertion by a seaman, working a forfeiture of wages, unless there is an abandonment of the ship and of her service, with an intent not to return.

[Cited in The John Martin, Case No. 7,357.]

2. The act of congress of July 20th, 1790 (1 Stat. 131), varies that qualification of the offence, supplies a new definition of it, prescribes the manner in which it must be proved, and fixes an inflexible punishment.

[Cited in The John Martin, Case No. 7,357; The Elwin Kreplin, Id. 4,427.]

3. Under the maritime law, courts of admiralty could mollify the penalty of absence without leave, and of desertion, and could do so upon evidence mitigating the offence, or showing the repentance of the deserter, at any reasonable time after the offence.

[Cited in The Swallow, Case No. 13,664; The Balize, Id. 809.]

4. The statute inflicts an absolute forfeiture of wages in both cases.

5. The construction of the statute. considered.

6. The mode of proof appointed by the statute must be strictly followed, in all particulars.

[Cited in Gifford v. Kollock, Case No. 5,409.]

7. A seaman has, under the statute, forty-eight hours to return to his vessel, after having absented himself from her without leave, and does not incur a forfeiture of wages if the vessel departs from the place before the expiration of the forty-eight hours.

8. If a seaman has permission from the second mate to go on shore. and acts in confidence upon such permission, he is not absent without leave from the commanding officer, although the chief mate or master is, at the time, on board.

9. Such permission to go ashore may be implied from the acquiescence or silence of the officers in command, or of the master on shore.

10. Where a seaman goes ashore temporarily, intending to return immediately, and makes all reasonable efforts to do so, if the master, knowing that he is on shore. prevents his reaching the ship, and the seaman is thus left in a foreign port, he is entitled to recover full wages for the voyage.

[Cited in Worth v. The Lioness No. 2, 3 Fed. 925.]

---

[1] [Reported by Samuel Blatchford, Esq., and Francis Howland, Esq.]
[2] [Reversed in Case No. 14,348.]

11. He can also recover the value of his wearing apparel and effects left on board the ship, and taken away in her, and not restored to him.

In admiralty. This was a libel in rem, by Peter Johnson, Harman Retan and William Brown, three of the crew of the ship Union, for wages for a voyage from New-York to Liverpool and back, and for the value of three chests of clothing. The libellants alleged, that they performed the voyage out, doing their duty in all respects, and unloaded the vessel at Liverpool, and loaded her for her return; that, whilst lying at Liverpool, the crew boarded on shore; that, on the 11th of August, 1836, the libellants had permission from the first officer, the master not being on board, to go on shore for their dinners; that they returned after an absence of twenty or thirty minutes, and found that the vessel had left the pier, and was lying off and on a short distance from it, and so near that they could distinguish persons on board; that they made signals to the vessel, and applied to the boat tending her to put them on board; that the boatmen refused, saying, that the master had given orders not to take them on board; that they remained on the pier, making all possible exertions to get to the ship, till she made sail, leaving them behind, and taking away all their clothing; and that the American consul took charge of them, and they returned to New-York by the way of Savannah, working their passage, and receiving no wages.

The claim and answer admitted the hiring for the voyage out and back, and the service and good conduct of the libellants on the voyage out, and on board until the 11th of August, and alleged, that while the master was on shore that day, making arrangements for the sailing of the vessel, the libellants went on shore and left the vessel, without the permission or consent of the first officer, and were forbidden by him to go on shore, and went with his knowledge, but in disobedience of his orders, and not intending to return. The claim and answer further alleged, that the cook and steward deserted the vessel the same morning; that, when the libellants left, there was no dinner cooked for them, but dinner was prepared on board at about two o'clock in the afternoon; that, at about half past eleven o'clock in the forenoon of that day, the vessel had hauled out of the dock to the pier-head, had all her sails hoisted, took a pilot on board, and was ready for sea, only waiting for the master to come on board; that the libellants well knew this, and also the necessity for leaving the port when the wind and tide were favorable, as both then were; that, at about twelve o'clock, the libellants left the vessel; that, at about one, she was ordered off the pier by the dockmaster; that, at half past one, the master came on board, and was informed of the absence of the libellants; that, in consequence of their absence,

the vessel lay to in the stream, backing and filling, and waiting for them, till near three o'clock; that nothing detained the ship but their absence; and that she would have put to sea immediately on the master's coming on board, but for that absence. The answer also denied that the libellants returned to the pier-head within half an hour after they left the vessel, and averred that the claimants did not believe they returned whilst the vessel lay off and on in the stream; that the master returned to the pier-head at a quarter past one, and that neither of the libellants was then there, nor did he hear of their having been there. The answer also denied that the libellants hailed the vessel or made signals, as, from the situation of the vessel, the signals could not but have been seen, especially as a telescope was used for the purpose of ascertaining whether the libellants were in sight. The answer also denied that the libellants endeavored to get a boat or be put on board, as they could easily have procured a boat. It also denied that any boatmen refused to put them on board, and that the master gave orders to any boatmen not to bring them off. It further averred that the master gave the shipping-master, who went ashore in the boat, orders to bring the libellants off, and, if they could not be found, to get others in their places; that no particular boat tended the ship; that the master was put on board only a few rods from the pier; and that, on the same day, the mate made an entry in the log-book, as follows: "At twelve, Pet. Johnson, Harman Retan and Will. Sands left the vessel without permission, after being forbid so to do." The answer also denied that anything was due to the libellants or to either of them, on account of wages, or that they had a right to receive anything for wages or clothing, as was sought and prayed by the libel, and insisted that the libellants had, by their desertion, forfeited all their wages and clothing, and all other things claimed by them, and all right to recover for the same.

Voluminous proofs had been taken in this country, and under commissions to England, in a suit between the United States and the present claimants, for not fulfilling the stipulations of the bond executed by them at the custom-house in New-York, for the return of the libellants in the ship. That cause had been tried before this court and a jury, and a verdict had been rendered in favor of the United States at the present term, and it was agreed by the counsel for the respective parties in this case that the proofs and arguments adduced on that trial should be regarded as addressed to the judge on this hearing, and be considered as applying to this case. The testimony and depositions thus adduced were, in many respects, discordant with those taken in the present case, and were in direct conflict upon the point as to whether the libellants had leave from the first mate to go ashore.

The proof was, that at the time the libellants left the vessel, the master was on shore, but the first and second mates were both on board. The second mate testified that the men asked him for leave to go on shore and get their dinners, and that he gave them leave, ordering them to come immediately back. Evidence was offered to show that the libellants applied to the first mate, and that he expressly forbid their going. Coffin, the first mate, swore that the libellants did not ask his leave to go ashore; that he forbade their going, when they were not more than twenty feet off; and that they heard him. The pilot, who was a witness for the claimants, did not hear any permission or orders given by either of the mates, but himself ordered the libellants to remain on board. The deposition of Edmonston, a bystander, on the part of the claimants, asserted that he heard the pilot and chief mate forbid the libellants' going ashore. On his cross-examination, he said that they "requested" the men to remain on board; that they replied to the mate that they would not be gone long, as they were only going for a glass of grog; and that he gave Johnson a sixpence for that purpose. Jones, another witness for the claimants, saw the libellants leave the vessel, did not hear permission given them, but heard one of the mates call out to them and ask them where they were going, and they replied that they would not be gone more than twenty minutes, and ran off.

On the trial at the suit of the United States, Retan, one of the libellants, testified that Johnson asked leave of both the mates; that the libellants all left the vessel publicly in sight of the crew; and that the first mate did not say a word, though he might have spoken to Brown. Johnson testified to the same effect, and also that the second mate told him that if he came back in half an hour it would be in time. Holmes and Kriegman, seamen on board, also testified that the libellants asked and obtained leave of absence from the first mate. Smith, the second mate, also swore that he heard the first mate give Johnson leave to go ashore, and that the other two men accompanied him. It further appeared, by the evidence of the claimants' witnesses, that the master met the libellants on shore as they were going from the vessel, and asked them where they were going; that they replied, "for a glass of grog;" that he told them to be back immediately, as he was going to sea directly; and that he then went to the ship and told the mate to get all ready and go out into the stream, and he would go and look for the men. There was much conflict in the testimony as to the length of time the libellants were absent, but the claimants witnesses stated that the master returned without the men, and put off from the pier in a boat, and that soon afterwards the men came down, and were upon the wharf when the boat returned. The first mate testified

that the master gave the boatmen orders to bring off the libellants; that nothing detained the vessel but their absence; and that he, the first mate, was on the look-out for them, and within hailing distance of the wharf, but could not see them. Edmonston, who was upon the pier, swore that the libellants were in fault in not returning. On the other side, the two boatmen swore that they received positive orders from the master not to bring off the libellants, and that one of them jumped into the boat for the purpose of returning, and was ordered out. Some of the crew and passengers swore that the men were seen by all on board, and that the general understanding was, that the vessel was waiting for a cook and a steward, and for some other men. The entry in the log was made on the same day, after the vessel had got under weigh and had left the port.

Washington Q. Morton, for libellants.
Elijah Paine, for claimants.

BETTS, District Judge. The purport of the pleadings between the parties, is, on the part of the libellants, to claim wages for the entire voyage stipulated in the articles, and also the value of their wearing apparel carried off in the ship, and not restored to them, on the ground that performance of the contract by them was prevented by the fault of the master; and, on the part of the claimants, to bar both demands, because the libellants had deserted the ship and had thus forfeited their wages and their clothing left on board. The controversy in the cause turns upon this defence; for it is not disputed that the libellants performed their duty during the voyage out, and were left in Liverpool by the departure of the ship.

There is a conflict in the testimony as to the manner in which the libellants were separated from the ship. It is a question to be decided by the evidence, whether the forfeiture demanded can be maintained either upon the general principles of the maritime law, or under the special provisions of the act of congress of July 20, 1790 (1 Stat. 131). The allegations in the answer, although not technically adapted to either branch of the defence, are substantially sufficient to put those points in issue, and to authorize a decree for the claimants, if they have sustained the defence by proof, and if the law entitles them to a judgment of forfeiture. The efforts of the defence have been mainly addressed to the point, that the libellants wilfully deserted the ship, and the testimony is to be first applied to that branch of the case.

Desertion is, by the law maritime, an unlawful and wilful abandonment of a vessel, during her voyage, by her crew, without an intention of returning to their duty. It is not a mere unauthorized absence from the ship without leave. Molloy, bk. 2, c. 3, pp. 248, 249; Abb. Shipp. (Ed. 1829) 134, 135;

3 Kent, Comm. 198. The one is an act of deep turpitude and disloyalty, evincing premeditation and criminality of purpose; the other often springs out of the improvidence and thoughtlessness which are incident to the habits and character of sailors. I have examined carefully the evidence produced by the claimants to establish the first charge, and no part of it, in my opinion, fixes upon the libellants an intention to abandon the ship. If the libellants went away from the ship without the permission of the officer in command, their going on shore at the time was disorderly and culpable. But the claimants show by their own proofs, that the libellants left the ship for an innocent object, and returned so soon to the place where they left her, and made such urgent exertions to get on board again as to demonstrate that they had no design to abandon her. This strips their act of the essential ingredient of a desertion under the maritime law. That is a high crime in all maritime codes. 1 Valin, Comm. sur l'Ord. de la Mar. bk. 2, tit. 7, art. 3, p. 534. Some of the early laws placed the desertion of a sailor from the merchant service, particularly if accompanied with a larceny, in the same rank with desertion from a ship of war, and subjected the offender to the punishment of death. Laws of Wisbuy, art. 61. By other laws, he was, for mere desertion, branded or imprisoned as a felon. Laws of the Hanse Towns, art. 43, cited in Malynes' Lex Mercatoria, App. 20. And, in the more humane usages and legislation of later times, desertion is punished by imprisonment of the deserter or confiscation of his wages and effects, or by both. Abb. Shipp. (Ed. 1829) p. 134. And, in England, the punishment is prescribed by act of parliament (Act 2 Geo. II. c. 36, §§ 3, 4; Act 31 Geo. III. c. 39, §§ 3, 4). In my opinion, the evidence disproves the charge that the libellants were guilty of desertion, as that offence is defined and punished under the maritime law.

If, then, the claimants show legal cause in bar of the action, and for the forfeiture of the demands sued by the libellants, it is under the other branch of the defence—that their absence constituted the offence called "desertion," in the act of congress of July 20, 1790 (1 Stat. 131), and made punishable as such. Under the maritime law, the courts exercised a discretion, in punishing malfeasances on the part of seamen, in derogation of their duty to the ship and of the authority of the master, but not amounting to wilful desertion, by a subtraction of wages, or by personal fine or imprisonment. Laws of Oleron, art. 20; Laws of Wisbuy, art. 17; Laws of the Hanse Towns, art. 40. The British parliament, to guard against severe punishments disproportioned to the offence, limited, by statute, the kind and degree of punishment which might be inflicted on mariners for leaving a vessel on a coasting voyage or in a home port, without permission of the officer in command. Molloy, bk. 2, c. 3, p. 249; Act 31 Geo. III. c. 39. The act of congress adopts, in almost the same words, the description of the offence of absence from the ship without leave of the officers, which is found in the English statute. But, creating a new method of proof, it declares an absence, so proved, to be a "desertion," carrying with it a forfeiture of the wages and effects of the seaman, and thereby raises what is a minor offence under the maritime law and the English statute to one of high magnitude under our statute, and makes no discrimination between absences at home, absences in coasting voyages and absences in foreign voyages. This court has always regarded our statute as not only determining the punishment which alone can be applied to this offence, but as intended to define "desertion," and to appoint the method by which that crime must be proved, before the serious consequences denounced against seamen can be incurred. It has, accordingly, been held, that every absence of a seaman from his ship, which is set up as a forfeiture of wages, must be proved in the manner directed by the statute, whether the leaving the ship was with the intention to desert or not. This principle is involved in the cases of The Cadmus [Case No. 2,280]; The Martha [Id. 9,144]; The Elizabeth Frith [Id. 4,361]; and several others. The doctrine deduced from that view of the law was, that acts of negligence or malfeasance in a crew, in respect to their remaining with the ship, could no longer be visited with a forfeiture of wages and effects, upon the common principles of the maritime law, nor unless the proof was made out in the way prescribed by the statute. As a necessary corollary from that doctrine, it was held to be indispensable to a conviction, to produce every particular of the proofs demanded by the act. It was also held, that the record in the log-book must declare the beginning and continuance of the absence, must be entered the day the seaman left the ship, and must assert that his absence was without the leave of the officer in command. A case decided by the circuit court for the First circuit has since been made public, which gives a different construction to the statute, and holds, in effect, that a new offense has been created and superadded by it to those existing under the law maritime, and that seamen remain liable, as before, to a confiscation of their wages, for abandoning their vessel with intent not to return to her, and may be convicted of that offence upon oral evidence alone. Cloutman v. Tunison [Id. 2,907]. This decision is high authority, and might have controlled the opinion of this court, if known to it at the time of the former adjudications; but I am not so convinced of the justness of the interpretation put by it upon the statute, as to retract the

previous views of this court and adopt that opinion in their place. I think that the case of Cloutman v. Tunison [supra] overlooks the probable policy which led to this enactment, and gives it an operation especially beneficial to ship-owners and injurious to seamen, without any compensatory privileges to the latter. The proneness of seamen to leave their ship whenever the opportunity presents itself, is as notorious as their characteristic restlessness of disposition and heedlessness of obligation. Their consequent exposure to sacrifice all their earnings by unauthorized absences from their vessel was apparent to congress. Ship-masters or owners, irritated by suits for wages, were accustomed, after voyages were ended, to oppose the actions, by setting up such absences, on oral proof, as acts of desertion, although they were overlooked and considered of no importance at the time. The rights of the men were thus placed at the discretion of the courts. Some tribunals, disposed to look with leniency upon their doings, would exact very clear evidence of wilful fault on their part, and of injury to the ship, and would demand clear proof that no disposition had been shown by the seamen to make amends or to return to duty, and would be inclined to impose the mildest punishment the case would warrant. Other judges, with a sterner eye to subordination, to discipline and to fidelity in the service, would call for a rigid compliance by seamen with every duty, and would, on slender proofs, adjudge the highest penalty of the law for absences of a venial character, even where the seamen had been anxious to return to their duty. For, although the law accorded to a seaman the privilege of repenting of his misconduct, and of being reinstated in the ship, on proffering proper amends, yet it left it to the discretion of the court to say whether repentance had come in due time and had been satisfactorily manifested. The sub-officers of the ship, harassed with actions by the seamen for alleged misusage on their part, or bearing grudges for personal indignities or wrongs received on the voyage, would be willing witnesses, at remote periods afterwards, to furnish evidence of absences or desertions during some period of the voyage. The act of July 20, 1790 (1 Stat. 131), operates to correct the unrestrained discretion of courts and the loose rules of evidence in relation to this subject; and it is reasonable to suppose that congress intended, by remedying those evils, to secure some equivalent to seamen for the new advantages conferred on ship-owners by the act, in rendering any casual absence by a seaman from his ship, for over forty-eight hours, without any intention to desert, cause for an absolute and unremittable forfeiture of wages.

Another prominent mischief in the existing law was, the want of a fixed rule, defining the offence of desertion and determining the time within which a seaman might repair his error by returning to the ship, and the master or owner be compelled to accept his return. It is hardly to be supposed that congress, in view of the state of the law maritime, as it then existed, and the class of men they were legislating about, passed the act in question with the idea that the public interest demanded that a sailor, who, in a spirit of frolic or heedlessness, dodges his officers and goes ashore for a spree, or gets into one after leaving the ship, and keeps away for more than forty-eight hours, should be subjected to no less a mulct than the absolute forfeiture of his wages and clothing, whilst his comrade, who, clandestinely, with premeditation, or openly, in defiance of the authority of the ship, abandons her, declaring his intention not to return, might come back at the end of a week or more, and, at the discretion of the court, and against the remonstrances of master and owner, be reinstated in his place, with a full right to his wages. I think it more reasonable to suppose that the statute was intended to reduce to certainty the loose rules respecting the signification and consequences of the crime of desertion, in order that masters, owners and mariners might know by what law they were governed, than to suppose that a legislation so formal, and burthened with such onerous forfeitures against seamen, was considered as called for, or was meant to be applied solely to the commonplace misdemeanor with seamen, of absence from the ship without leave. It is not my purpose to discuss the question as to the true construction of the provisions of the statute. These suggestions are made as an apology for adhering to the interpretation adopted by this court, until an exposition of the law shall be given by the supreme court or by the circuit court for this district, which will be conclusive upon this court. In my judgment, then, the departure of the libellants from the ship, whether alleged against them as a wilful desertion or as an absence without leave, must, in order to subject the libellants to a forfeiture of their wages and property, be established by the evidence and in the manner prescribed by the statute.

The preliminary or documentary proof by the log-book, demanded by the statute, is sufficiently made out in point of form, in respect to two of the libellants—Peter Johnson and Harman Retan. The other libellant, William Brown, is not mentioned in the log. His name is in the articles. William Sands is named in the log, with Johnson and Retan, but the mate does not prove, if such testimony could be competent, that the entry was intended to be "Brown" instead of "Sands." In regard to Brown, therefore, the evidence is vitally defective in this particular, and, accordingly, no forfeiture of wages and clothes, under the provisions of the act of congress, can be set up as to him.

I think, also, that there is a cardinal de-

fect in the claimants' evidence in respect to the other libellants. The ship went to sea within two or three hours after the men had left her and of course they could not have returned to her within forty-eight hours. It may, perhaps, be open to debate, whether, in case of a faulty absence, the seaman is not to take the risk or peril of being able to get back to the ship within the time limited. Whether this would be so in the case of a disability solely personal to the seaman, need not now be considered. For, in the present case, the preventive cause existed in the ship and in her officers alone. The statute grants to seamen who improperly leave their ship, a locus penitentiæ of forty-eight hours. Until the completion of that term, no cause of forfeiture comes into existence. This would be the reasonable interpretation, if the penalty had been declared for the mere act of absence for so many hours. But the language of the statute makes it plain, that it intended the seaman should have the benefit of every hour out of the forty-eight, to return to the ship, and that no forfeiture arises unless that time has been allowed him. The enactment is: "If such seaman shall return to his duty within forty-eight hours, he shall forfeit three days' pay for every day he shall so absent himself, to be deducted out of his wages; but, if he shall absent himself for more than forty-eight hours, at any one time, he shall forfeit all the wages due him," &c.—that is, he is subject to a fine of six days' pay, and no other punishment, if his absence continues the whole forty-eight hours. The forfeiture does not begin to attach before forty-eight hours of absence have expired, within all which time the seaman must have neglected to return to his duty. This necessarily imports that the ability to return was not withheld from him for that time. But if within three hours the vessel went to sea, and put it out of the power of the libellants to return to their duty, it seems to me that the owners cannot be permitted to make the volition and act of the master change the fine of six days' pay appointed by the statute for an absence of two days, into an instant forfeiture of wages for perhaps as many months, or for a year, already earned. Had the ship been destroyed by fire in the harbor, or been sunken there before the forty-eight hours ran out, could a forfeiture be exacted of these men? Yet, in respect to their right to elect to return within the time limited, it is the same whether the ship was physically destroyed, or was removed out of the way, so as to render it impracticable for them to join her. If the claimants demand a forfeiture under this act, they must show the commission of the offence within the terms of the law. In respect to the punishment now sought to be inflicted under this statute, the case stands as if the law had granted an absolute furlough or leave of absence to the libellants, at Liverpool, for forty-eight

hours, independently of the consent of the master or officers, and without the limitation or condition that the vessel should remain so long in that place. Clearly, the master could not, at his own volition, by removing the ship and thus preventing the return of the libellants at the end of the furlough, convert that privilege into an offence which should carry with it the confiscation of the wages and wearing apparel of the men. The act provides, in effect, for a statutory furlough or leave of absence, with the limitation that the seaman may, at the option of the master, be compelled to pay three days' wages for each day's privilege of absence. In the present case, the privilege was defeated by getting the ship off, without the assent or knowledge of the seamen, before the expiration of the time allowed them to redeem the forfeiture, if a technical one had been incurred, and thus a punishment not authorized by congress is imposed upon them.

The argument that the libellants went on shore in their own wrong, knowing the ship was to go to sea immediately, and thus by their misconduct caused a delay of the voyage and other injuries, does not obviate the objection to the forfeiture now demanded. That act of irregularity may bring them within the penalties of the law maritime, but it is not the offence made punishable by forfeiture of wages under the act of congress; and no punishment greater than that which is directed by the statute, can be inflicted because of the wrong motives of the men. The statute does not make the intent or purpose with which the forbidden act is done, a constituent of the offence; but, assuming that the crew leave the vessel wrongfully, it allows them the full period of forty-eight hours within which to avoid the forfeiture.

I am satisfied, therefore, that the statutory judgment of forfeiture is not incurred in this case, because the means of returning to their duty on board were withheld from the libellants by the act of the master. It does not follow that a dereliction of duty will pass unpunished because an entire forfeiture of wages and effects is not imposed. The compensation which the owners may demand and obtain may be equal to or beyond the amount of the wages. But it is important, in respect to the powers of the court and even the principle upon which punishment is to be decreed, to ascertain the operation and meaning of the statute. For, though the injury be ever so trivial and the amount of wages due be ever so great, yet, when the case is brought within the statute, the court can pronounce no other judgment than one of forfeiture; whereas, if the case be one of misconduct, in violation either of the shipping articles or of the duty of the mariners under the maritime law, the court can apportion the compensation according to the nature and consequences of the offence and of the injury.

The remaining inquiry relates to the truth of the entry in the log; that is, whether the defence that the libellants were absent from the ship without leave, is supported. It is proved that the libellants had leave from the second mate to go on shore for their dinner; and, if they went upon that authorization alone, I think their case is taken out of the interdiction of the statute of "absenting themselves from the ship without leave of the master or officer commanding on board." The master was on shore at the time, and the first and second mates were on board. Of course, the permission of the master need not be shown. In the merchant service, the master, when present, and after him the mates, pursuant to their grades, are to be regarded as "commanding on board," according to the order and discipline of the service. There can be no doubt that the authority of those officers, when exercised by them according to their grades, must be obeyed by the crew. Still, it will rarely be the fact that the master, even when on board, actually exercises the command in all particulars at any time, or that the orders of the mates are not to be observed, whether they emanate directly from the master or are unknown to him. The phraseology of the statute is not to be understood as having relation to the ultimate authority on board. Each officer is "commanding on board" in his particular department, although all are present. No vessel could be navigated if this were not so; and, as a sailor could never refuse obedience to an order of a mate, in the proper business of the ship, on the ground that it did not come from or was not known to the master, so, in relation to relief from duty, he would be well justified in acting under the authorization of a mate merely, if the order was not superseded by a superior officer. It must necessarily be that the mates will have the principal charge of the employment and relief of the men; and, as either of the mates may set them to work when the business of the ship requires it, so, also, each is impliedly clothed with sufficient authority to grant them an excuse from work or the indulgence of absence. Seamen are not bound to know the manner in which commands are distributed amongst the officers on board, unless they are specifically notified. As each officer is entitled to their full obedience, so, also, are they well justified in looking to each as competent to accord them privileges and indulgences in respect to their duties. Unless, therefore, there is a standing order to the contrary, or the individual is, in the particular case, otherwise directed, a sailor who obtains permission from any officer to go ashore, cannot be proceeded against as absent without leave, within the purview of the statute. Regarding it as implied upon the proofs, that no order had been given to the crew of this vessel that they should ask leave of absence only from the first officer on board at the time, I think the permission of the second mate was a sufficient justification to the libellants. He was "commanding on board," in so far as to be authorized to give them the temporary leave of absence they requested.

Evidence, however, is offered to show that the first mate expressly forbid the libellants to leave the ship. If a conflict of orders between the officers occurs on board, no doubt the seamen are bound to obey the one highest in command; and the chief mate, as an ordinary rule, would have authority to revoke any permission to go ashore given to the men by the second mate. It is alleged that such revocation was made in this case, in two ways—first, in refusing leave to the men, when they afterwards applied to the first mate; and secondly, in ordering them back to the ship after they had got on shore. There is no witness but the chief mate who proves a direct refusal of leave. The pilot, who was standing by, does not confirm him; and several other witnesses, examined by the libellants, heard no such command. The evidence of Edmonston, when taken together, rather imports the consent of the chief mate, as the refusal first testified to is softened down to a request to the men to remain on board, accompanied by a donation of sixpence, asked by one of the men for the purpose of getting grog on shore. The proof may be equivocal as to whether the sixpence was given by the chief mate or by the witness; but if by the latter, as it was at the moment the men were saying to the mate they were only going for grog, and, as they thereupon went off without anything further being said by him, his acquiescence may be fairly implied. The same inference would arise from the testimony of Jones. The evidence on the part of the libellants, giving it the least possible weight, puts the matter so far in doubt, that the court cannot satisfactorily say, upon the proofs, that the libellants went ashore without the leave of the first mate. As the two mates swear in direct contradiction upon this point, that conflict, if there was nothing in the proofs demanding credit for the one above the other, would place the cause in a situation where a judgment of forfeiture could not be properly awarded. But I think the collateral evidence is corroborative of the second mate's account, and adverse to that of the first mate. There is evidently a coloring in the first mate's testimony, hostile to the libellants. He asserts that the master told the boatmen to bring off the libellants in particular, while both boatmen swear that the orders were directly the contrary. He also says, that nothing detained the vessel but waiting for the libellants, and that he was on the look-out for them, but saw nothing of them on the pier after the vessel cast off, though she came up within hailing distance. It is very clear that it was well understood on board that

the men were on the pier, and that they were seen by the master and the pilot, and were also pointed out by one of the mates to a passenger, who, though near-sighted, saw one of them. It is scarcely credible, therefore, that the first mate could be on the look-out for them, and yet be ignorant of what was so generally known on board. There is, also, upon the proofs, the strongest reason to believe that the vessel was not lying to solely for these men; and it is difficult to suppose that the first officer thought that that was the reason of the delay.

If, then, the case stood solely upon these proofs, I should be of opinion that no ground for a forfeiture of wages had been established against these libellants. But the evidence by the claimants' witnesses, as to the master's meeting the libellants on shore as they were going from the vessel, is equally fatal to the defence. What then occurred between the master and the libellants was a direct assent by the master to their going. The same testimony is also cogent to show, that there was then no suggestion made by the mate that the men had deserted or gone off without permission, and that he must have well known of the master's acquiescence in their absence. In either aspect of the case, the entry in the log, that the libellants were absent from the ship without leave, was not warranted by the facts, and the allegation of their desertion and forfeiture of wages is clearly rebutted.

The remaining consideration is, whether the libellants, by such departure from the ship, were guilty of misconduct injurious to the owners, entitling the latter to claim a compensation for damages or a subtraction of wages. If the proofs were satisfactory, that the men left the vessel in disobedience of the orders of the first mate, or even privately, without permission of any officer, I should regard such conduct as rightly depriving them of all claim to wages subsequent to that time, and also as rendering them responsible, out of their anterior wages or their effects, for the damages occasioned by their absence, notwithstanding the statutory proofs are of no avail against them, it being competent for the court, under the maritime law, to recompense the ship for wrongs done by the crew, either by imposing a fine or a subtraction of their wages. Cons. del Mare, c. 169; Laws of Oleron, art. 5; Laws of Wisbuy, art. 17. But it seems to me that the preponderance of evidence is clear, that the libellants had the sanction of the proper officers to their going ashore, or that, even if the first mate did refuse them leave, which I do not consider as proved, his order was superseded by the subsequent assent of the master to their being on shore.

There is, as would naturally happen, a wide difference between the witnesses, in their estimate of the time the libellants were absent. Had their stay been unreasonably protracted, that would of itself be ground for damages or compensation to the owners. But I think that the witnesses for the claimants state facts which show that the libellants' return followed closely upon that of the master. All the detention the vessel need have incurred, if she was waiting for the libellants alone, would have been to allow time for the boat to make a trip from the vessel to the shore and back, a distance not exceeding a mile in the whole, and one easily rowed in a few minutes. It is certain that the libellants made efforts to reach the vessel in that manner, the moment the boat touched the pier. The statement of the boatmen in respect to the master's orders is more likely to be accurate than that of the mate or that of a casual bystander like Edmonston. Indeed, the evidence very strongly imports that the master intended to desert the men, with a view probably to save the expense of their wages home. If that was not his purpose, his conduct evinced, at least, that he meant to put himself upon the strictest point of right, and to leave the libellants to get back to their duty at their peril. If, ordinarily, he might have had a right so to do, it was not allowable in this case, he having sent to the libellants a message signifying unmistakably that he did not mean to permit their return. After they learned from the boatmen the master's orders, they were excused from any further exertions to join the vessel. The master placed himself in the wrong, and, both by his orders and his conduct, prevented the libellants from performing their voyage, which they were ready and anxious to do. They are, therefore, entitled to full wages for the voyage out and back, and also to an indemnity for the value of their property left on board. A decree will be entered in conformity to this decision, with a reference to the clerk to ascertain the amounts due.

Decree accordingly, with costs.

[On appeal to the circuit court, the above decree was reversed. Case No. 14,348.]

UNION, The (DEARBORN v.). See Case No. 3,714.